Filed 10/14/21  P. v. Luna CA3
Opinion following transfer from Supreme Court

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C087634 |
| Plaintiff and Respondent, | (Super. Ct. No. 16F5596) |
| v. | OPINION ON TRANSFER |
| JOSE ORLANDO LUNA et al., | |
| Defendants and Appellants. | |

In 2017, a jury convicted defendants Jose Orlando Luna, Felix Ruben Ayala (born in 1971), and Felix Ruben Ayala (born in 1979)[1] of conspiracy to commit robbery on four separate dates in October 2015 (counts 2, 7, 21, 32) and additional charges related to each conspiracy:

---

[1] Because Felix Ruben Ayala (born in 1971) and Felix Ruben Ayala (born in 1979) share the same name, we will refer to them as they have been referred to on appeal and in the trial court—as Phil and Ruben, respectively.

1

With respect to their October 4, 2015 conspiracy (count 2), defendants were also convicted of the murder of Bradley (count 1), robbery in concert of Bradley (count 3), first-degree residential burglary (count 4), assault with a firearm on Bradley (count 5), and false imprisonment by violence of Bradley (count 6).

With respect to their October 25, 2015 conspiracy (count 7), defendants were also convicted of kidnapping for robbery of Robert and Joe (counts 8 and 9), robbery in concert of Robert, Michael, Jennifer, Michael's father, and Michael's mother (counts 10-14), first-degree burglary of a home occupied by Robert (count 15), first-degree burglary of a home occupied by Michael and Jennifer (count 16), assault with a firearm on Robert (count 17), false imprisonment by violence of Jennifer's children (counts 18 and 19), and cutting a utility line (count 20).

With respect to their October 26, 2015 conspiracy (count 21), defendants were also convicted of second-degree robbery of B.T., Marc, Jason, and Taylor (counts 22-25), assault with a semiautomatic firearm on B.T. and Taylor (counts 26 and 27), false imprisonment by violence of Marc, Jason, and Taylor (counts 28-30), and taking or driving a vehicle without the owner's consent (count 31).

With respect to their October 2, 2015 conspiracy (count 32), defendants were also convicted of attempted residential robbery in concert (count 33), attempted first-degree residential burglary (count 34), and assault with a semiautomatic firearm on B.T. (count 35).

The jury found true that each defendant was armed with a firearm as to all counts. (Pen. Code, § 12022, subd. (a)(1).)[2]  Additionally, the jury found true that the robberies or attempted robbery referred to in counts 3, 10-14, and 33 were in the first degree.

---

[2] Undesignated statutory references are to the Penal Code.

The jury also found true that Phil personally used a firearm in the commission of counts 7 through 14 (§§ 12022.5, subd. (a), 12022.53, subd. (b)) and 15 through 20 (§ 12022.5, subd. (a)).

In a bifurcated proceeding, the court found that Phil had suffered two prior manslaughter convictions in New York that qualified as serious and violent felonies under section 667, subdivision (a)(1) and the three strikes law (§ 1170.12).

At sentencing, the trial court imposed aggregate prison terms as follows: 466 years to life plus 172 years and four months as to Phil; and 39 years to life plus 36 years as to Ruben and Luna.

On appeal, defendants raised numerous contentions of trial and sentencing error. In our prior opinion, we rejected Phil's contention that the trial court erred by admitting eyewitness identification testimony because the witnesses were shown a photo lineup that was unduly suggestive and their identifications were unreliable. We also rejected Phil's contention that the trial court violated his right to a fair trial and the effective assistance of counsel by denying his motion for a mistrial after the death of a former defendant in this proceeding. We rejected the additional assertion that Phil's counsel rendered ineffective assistance. We further rejected Phil's and Ruben's claims of instructional error. We concluded defendants' convictions for murder may not be reversed on direct appeal based on Senate Bill No. 1437 (2017-2018 Reg. Sess.). We concluded there was insufficient evidence to support defendants' convictions as to count 31. We also held the evidence was insufficient to support the trial court's finding that one of Phil's New York convictions for manslaughter was a serious felony and a strike under California law for sentencing purposes. We rejected defendants' other assertions of insufficiency of the evidence. We accepted the People's concession that defendants' sentences on counts 5, 6, 20, and 30 must be stayed pursuant to section 654. We further concluded the abstracts of judgment must be corrected to reflect defendants were convicted of first-degree murder, and Ruben's and Luna's abstracts of judgment must be corrected to reflect an

3

unstayed term of life in prison with the possibility of parole with respect to counts 8 and 9. Additionally, as to Ruben and Luna, we explained the court imposed an unauthorized sentence on count 32 and must instead impose a sentence of nine years on count 35. In all other respects, we affirmed the judgments.

Defendants petitioned our Supreme Court for review. Ruben's petition was denied. With respect to Phil and Luna, the Supreme Court granted review and deferred the matter pending consideration and disposition of a related issue in *People v. Lemcke*, S250108, or pending further order of the court.

On May 27, 2021, the Supreme Court issued *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*).

On August 25, 2021, the Supreme Court transferred the matter back to this court, with directions to vacate our decision and reconsider the cause in light of *Lemcke*. We vacated our opinion on September 1, 2021. Phil and the People filed supplemental briefs. Luna notified this court that he was submitting the case based on his opening brief and reply brief, neither of which contained any briefing on the issue addressed in *Lemcke*.[3]

After consideration of *Lemcke*, our conclusions remain unchanged.

## I. BACKGROUND

*A.      October 2, 2015 (Counts 32-35)*

Phil, Elioenaid Rivera, and Sergio Martinez drove from New York on September 29, 2015, and arrived in Red Bluff on October 2. At 3:00 p.m. that day, Phil took a video of himself, Ruben, and Luna in which he referred to them as the "dream team."

---

[3] In the Supreme Court, Luna's petition for review incorporated by reference and joined in Phil's and Ruben's requests for review. To the extent Luna has joined in Phil's arguments related to *Lemcke*, we reject them for the reasons set forth in this opinion.

4

At the time, Ruben and Luna lived on John's property in Shingletown. They helped him clean up the property and set up an indoor marijuana grow. John would let Ruben and Luna borrow his silver car.

B.T. was an employee at a hydroponics store who lived in Shasta Lake City, where he grew marijuana at his residence. He knew Ruben through the store, and Ruben had been to B.T.'s residence to buy marijuana. B.T. testified that, on October 2, he was planning to harvest his marijuana. That evening, Martinez and Rivera pulled into his driveway in a silver car that B.T. had seen Ruben driving a few months earlier. They asked if a car that was broken down in B.T.'s driveway was for sale. When B.T. said no, they drove away but then made a U-turn and parked 50 to 75 yards away. B.T. went to confront them with his dog, but they left before he reached them. B.T. kept walking around the block and saw Ruben and Luna in a different vehicle. B.T. expressed concern about what had happened with Martinez and Rivera, but Ruben and Luna drove away.

Shortly after B.T. returned home, the silver car pulled into his driveaway again. B.T. armed himself with a shotgun. When B.T. opened the door, Martinez pointed a semiautomatic pistol at him. One of the two men struck and disarmed B.T., and then B.T. wrestled with Martinez. Martinez fired his gun, leaving a hole in the front door. The men fled when one of B.T.'s roommates emerged from the house armed.

An investigator for the Redding Police Department testified that call detail records indicated phones associated with Ruben and Phil used the cell tower closest to B.T.'s house between 6:42 p.m. and 7:15 p.m.[4]

---

[4] The defense's expert witness regarding cell phones and interpreting call detail records opined that the records and the presentations from the prosecution's investigator regarding those records were unreliable.

5

B.     *October 4, 2015 (Counts 1-6)*

Bradley was a regular customer at a store that sold used grow equipment. On September 28, 2015, he was at that store talking to Ruben.

By October, Bradley's marijuana was ready to be harvested and some of it was being harvested.

On the evening of October 4, 2015, Bradley was discovered dead on the floor of his kitchen in Redding.

The front door was closed, and there were two bloody shoe prints on the porch that appeared to come from different shoes.

A zip tie around Bradley's right wrist was connected to another zip tie that was enclosed but not attached to his body. Two more zip ties that were interconnected were next to his body. His hand had hair stuck to it.

One of the bedrooms had remnants of what looked like marijuana. It had no bed and appeared to be a place to store or dry marijuana. There were marijuana plants in the backyard and hanging from the garage ceiling.

On the carpet in the living room and near the entryway to the hallway, officers found a diamond stud earring. They also found buckets of marijuana inside the house. The cupboard doors were opened. DNA from the earring matched Rivera's.

Bradley's computer was last used at around 2:15 p.m.

The forensic pathologist who performed an autopsy on Bradley testified that his cause of death was "multimodality homicidal violence." Bradley "had an injury of every class." He had injuries caused by sharp instruments, such as a seven-inch incision on the front of his neck, and injuries caused by blunt force, including a fractured nose and broken ribs. The neck incision came last.

The investigator presented evidence that defendants' phones all utilized the cell tower closest to Bradley's residence between 2:19 p.m. and 2:44 p.m. on October 4, 2015. There were calls between Ruben and Luna, Martinez and Luna, and Martinez and

6

Phil. By 8:00 p.m., Ruben's phone was in Shingletown (where he lived with Luna) while Martinez's and Phil's phones were in Red Bluff. Phil and Martinez headed back to New York City, arriving on October 10. During the drive, Phil took a video of himself, Martinez, and another man in which Martinez said, "You call me hitman. You call me the price is right." Martinez asks, "What are we up to like I think what 26?" and the man responds, "You up to 35 bodies right now." On October 20, Phil and Martinez left New York. On October 22, they arrived back in Red Bluff.

C.      *October 25, 2015 (Counts 7-20)*

On October 25, 2015, Michael lived in Live Oak with his mother, father, Jennifer, and Jennifer's two children. Robert rented the guest house. Michael had harvested 52 of the approximately 85 marijuana plants growing on his property, while the remainder, which belonged to Robert, had not been.

Michael's father saw three or four men approach the house wearing shirts or jackets with "DEA" on them. Michael's father testified that one of the men was Phil, and Phil was carrying a rifle or shotgun. Michael's father told the men that the marijuana grow was legal, and Phil responded that it was not recognized by the federal government. Phil led Michael's father inside and told him to stay in the living room.

Michael testified that his father came in and said federal agents were there. Phil and another man took Michael to the living room and sat him down with his father. One of the men had a shotgun. Phil had been to Michael's house with another man about three weeks earlier asking to buy marijuana. Michael had said he did not sell it.

Jennifer testified that a man with a gun led her to the living room. When they were there, he threatened her daughters with his gun pointed at them. She saw five strangers in total. Phil did not have a weapon, but he was giving orders.

Robert testified that he and Joe were almost finished processing marijuana in Robert's house when several men, including Ruben, entered, threw Robert on the ground, and put a gun to his head. After 15 or 20 minutes in which the men removed tubs of

7

marijuana and searched the house, Robert and Joe were taken to the main residence by gunpoint. They were put in the living room with Michael, his parents, Jennifer, and Jennifer's children, and told to sit quietly.

Once everyone was in the living room, the intruders went through other rooms. They removed tubs of marijuana from the main house as well. Michael realized the men were not law enforcement when he saw them wiping off the front door handle as they left. After they left, Michael learned the phone line had been cut. Other items were stolen in addition to marijuana, including firearms, cell phones, and laptops.

Defendants' cell phones used cell towers near Michael's residence between 6:47 p.m. and 8:28 p.m. on October 25, 2015. By 11:00 p.m., the phones associated with Ruben and Luna were in Shingletown, while those associated with Phil and Martinez went to Red Bluff.

D.     *October 26, 2015 (Counts 21-31)*

John testified that, on October 26, 2015, Luna drove him in a U-Haul to a hardware store to meet Larry while Ruben went in a truck. Phil arrived in a car with three other people. Larry arrived in his green van. John explained that Larry's van left, and then John, Larry, and Luna got into the U-Haul. When they left, John did not know where they were going, but when they arrived at the hydroponics store, he recalled a previous discussion about getting soil. Luna backed in the U-Haul for loading and was on his phone speaking in Spanish.

B.T., Taylor, and Jason were working at the hydroponics store in Redding. About 30 minutes before the store closed at 6:00 p.m., a young Hispanic man entered and asked about a $5,000 trimming machine despite not having $20 to buy the item he placed on the counter.

At about ten minutes before closing, Taylor saw a green van pull into the parking lot and then leave.

8

Shortly before 6:00 p.m., three men came into the store across the street, including Phil who purchased a drone. He was talking on the phone in Spanish. One of the men went to the window that faced the hydroponics store.

Meanwhile, back across the street, Marc entered the hydroponics store to buy scissors. There were no other customers.

Two or three men entered wearing "DEA" uniforms and told everyone to get down on the floor. Taylor recognized one of them from the van. B.T. recognized Rivera and Martinez from their earlier encounter at his home. Martinez had a semiautomatic handgun. B.T. did not get down, and Martinez struck him with the gun, causing B.T. to lose consciousness.

One of the men handcuffed Marc and took some of his belongings, including at least $300. The men took cash from Taylor and the register as well. They also asked for marijuana but were told the store had none.

The men took the trimming machine. They were talking to someone outside of the store in Spanish using a radio or cell phone. One of them said, "Yes. Yes, Sergeant. We have all the suspects detained. Bring in the van for transport."

When B.T. regained consciousness, he was led outside to a green van. There was another vehicle there with several individuals waiting outside of it. B.T. told the men he could get them into the safe if they took him back inside. They did so, and he gave them the instructions for opening the safe. The men then took cash from the safe.

John testified that he walked into the store and saw what appeared to be one of the men from the hardware store with a gun on his hip and wearing a DEA uniform. John returned to the U-Haul and told Luna and Larry that he wanted to leave because there was a raid going on. Luna stayed, while John and Larry left on foot. As he left, John saw the man with the gun leading another man out to the van. John also thought he saw the car that Phil had arrived at the hardware store in at the parking lot of the hydroponics store.

By October 29, 2015, Phil and Martinez were driving back to New York.

9

*E.      Phil's Testimony*

Phil testified at trial; Ruben and Luna did not. Phil testified that he sells only marijuana grown indoors and only three particular strains. He explained that marijuana that is grown outdoors is not profitable. He said he drove to California to purchase more marijuana, and he would not get on a plane with $100,000 in cash. Martinez is his foster brother and he accompanied Phil on two drives to California. The two of them also invited Rivera, who knew both of them and was friends with Martinez.

Phil said he was not at B.T.'s house on October 2, 2015. He napped while Ruben and Luna went to purchase marijuana in his rental car. Phil may have left his phones in the car.

Phil said he was not in Redding on the day of Bradley's murder and did not conspire to rob him.

Likewise, Phil testified he was not present for the October 25, 2015 robbery and did not conspire to commit the robbery or help anyone to commit the robbery.

Phil said he was not part of a plan to rob the hydroponics store. He went to the hobby store across the street to buy a drone for his stepson. Phil said he later learned what happened at the hydroponics store and explained that Rivera is "a loose cannon."

## II.  DISCUSSION

*A.      Identification Procedures*

At trial, the four witnesses to the October 25, 2015 robbery who testified each identified Phil. Previously, in August 2016, the investigator for the Redding Police department showed the witnesses a photo lineup. The witnesses each identified Phil, although Michael's father was not sure his identification was correct. Phil argues the admission of the eyewitness identification testimony violated his right to due process because the photographic lineup was unduly suggestive, and the identifications were unreliable. We disagree.

10

*1.     Pre-Trial Proceedings*

Before trial, Phil moved to exclude any in-court or out-of-court identifications of him by the witnesses to the October 25 robbery on the basis that the procedures used to acquire them were unduly suggestive. Phil's counsel indicated the witnesses had been shown a photo lineup in which Phil was "the only one that has white markings around his lips, and it's very pronounced in the black-and white photographs." Counsel argued the witnesses "have been refreshed with the use of a photograph of a person that has the very condition that they identified at the scene," and they were only identifying Phil based on his skin condition.[5] Counsel did not provide the court with the black-and-white photocopies of the lineup to which he referred, and indicated he did not have color copies.[6] The court asked, "That's such a unique physical characteristic, how could you reasonably locate other individuals?" Phil's counsel suggested it would not be difficult "with the Internet" and that the rarity of the condition made the procedure unduly suggestive. In response to the court's questioning, counsel stated that the other individuals in the lineup were "Hispanic males of varying degrees of darkness."

The court explained, "I'm not making a finding of fact here, but it is interesting to note from the bench, looking at your client, I . . . don't discern substantially noticeable spotting on his face. . . . [I]t seems like a motion like this would go to weight." The court explained that it did not find a "degree of differentiation" that would be problematic. The court denied the motion "[b]ased on the case law and the offer of proof."

---

[5] During cross-examination by Phil's counsel, three of the witnesses testified that they told law enforcement that one of the perpetrators had white pigmentation around his mouth.

[6] Phil does not cite to any version of the lineup on appeal.

11

*2.    Analysis*

" 'In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification.' [Citation.] 'We review deferentially the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive.' [Citation.] 'Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification.' " (*People v. Alexander* (2010) 49 Cal.4th 846, 901-902.)

As to the first consideration, "defendant has the burden of showing that the identification procedure was unduly suggestive and unfair 'as a demonstrable reality, not just speculation.' [Citation.] A due process violation occurs only if the identification procedure is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' " (*People v. Cook* (2007) 40 Cal.4th 1334, 1355.)

Phil's argument is essentially that the identification procedure was unduly suggestive as a matter of law because Phil's photograph was the only one that depicted a unique facial feature that three of the four eyewitnesses had already observed, and therefore could identify him by.

As a constitutional matter, "there is no requirement that a defendant in a lineup, either in person or by photo, be surrounded by others nearly identical in appearance. [Citation.] Nor is the validity of a photographic lineup considered unconstitutional

12

simply where one suspect's photograph is much more distinguishable from the others in the lineup." (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1052.) Nor has our Supreme Court suggested it is appropriate to consider one unique feature to the exclusion of all others. (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 943 [" '[I]t would be virtually impossible to find five others who had' a similar eye 'and who also sufficiently resembled defendant in other respects' "].) " 'Because human beings do not look exactly alike, differences are inevitable. The question is whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' " (*Ibid.*) We cannot conclude, based on the record before us, that one unique feature created a substantial likelihood of irreparable misidentification.

As the trial court indicated, on this record, Phil's unique facial feature went to the weight of the identifications but did not render the procedure unduly suggestive as a matter of law. (See *Simmons v. U.S.* (1968) 390 U.S. 377, 384 [danger that use of photographic lineups "may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error"; convictions will be set aside only if the "procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"].) At trial, Phil's counsel was able to cross-examine the witnesses as to basis for their identifications. In response to this questioning, Robert stated the skin pigmentation issues were "an easy way" to identify Phil. Jennifer testified Phil was easy to identify, but the scars were not the only reason she could identify him. Michael merely agreed the photo he identified was the only one that showed a person with skin pigmentation issues. Michael's father testified that he identified Phil based on facial features and was unaware of any skin pigmentation issues. We agree with the trial court that defendant has failed to show that the identification procedures were unduly suggestive. (*People v. Cook, supra*, 40 Cal.4th at p. 1355.)

Even if the photo lineup was impermissibly suggestive, we would conclude that the witnesses' identifications of Phil were nevertheless reliable under the totality of the circumstances. It is undisputed that the witnesses who identified him had an opportunity to see him. At least one had a conversation with him. With respect to the witnesses' degree of attention and accuracy, three witnesses observed pigmentation around Phil's mouth that the trial court did not find "substantially noticeable." Finally, Phil concedes the witnesses were confident in their identifications. Only the nearly 10-month lapse of time between the offense and the initial identification weighs in Phil's favor; the totality of the circumstances does not.

Phil's arguments attempt to circumvent the factors courts consider when evaluating the totality of the circumstances. He points to discrepancies in the witnesses' description of other suspects or the racial makeup of the group of intruders that we do not find persuasive because the inquiry is the accuracy of the descriptions and identification of Phil. Phil cites cases in which experts testified that where a weapon is involved in a crime, the accuracy of a witness's identification decreases.[7] Neither case suggests that, as a matter of law, the court should discount an identification under the totality of the circumstances based on the mere presence of a weapon. (See *People v. Johnson* (1992) 3 Cal.4th 1183, 1210 (*Johnson*) [noting professor of psychology testified for the defense and "described a phenomenon known as 'weapon focus': when a crime involving a weapon occurs, the weapon's presence can capture a great deal of the witness's attention, which can lead to reduced ability to remember and accurately describe other details"]; *People v. Brandon*, *supra*, 32 Cal.App.4th at p. 1044 [noting psychologist "stated that research shows the accuracy of a person's identification decreases when the person is frightened or when a weapon is present"].) Similarly, we reject Phil's suggestion that the

---

[7] At trial, similar testimony was introduced in this case.

witnesses' level of certainty should no longer be a factor.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

As the United States Supreme Court stated in *Neil v. Biggers* (1972) 409 U.S. 188: "It is the likelihood of misidentification which violates a defendant's right to due process . . . ." (*Id*. at p. 198.)  The totality of the circumstances in this case reveals no such likelihood.

B.      *Phil's Motion for Mistrial*

Phil contends the trial court violated his right to a fair trial and the effective assistance of counsel by denying his motion for a mistrial after the death of Rivera.  We disagree.

1.      *Trial Court Proceedings*

Rivera was charged as a defendant in these proceedings.  At the preliminary hearing, evidence of his prior statements to law enforcement were introduced.  As to the robbery at B.T.'s residence, Rivera had stated that the plan was to steal marijuana or money, and defendants were all present.  Rivera had given three different versions of what happened regarding Bradley's murder.  At one point, Rivera indicated defendants went to Bradley's house in two vehicles and Phil stayed outside.  Rivera said Martinez cut Bradley's throat when he would not tell him where items were inside the house.  Rivera explained that the October 25 robbery was the only one where Phil dressed up and actively participated as opposed to being ancillary or on the outside assisting.  Prior to trial, Phil's counsel unsuccessfully moved in limine to set aside Rivera's plea agreement and exclude his testimony.

Opening statements began on October 24, 2017.  On November 22, the prosecutor learned Rivera had committed suicide and informed counsel.  The prosecutor finished presenting her case-in-chief on December 6.

The following day, Phil's trial counsel moved for a mistrial "on the basis that the changed circumstance with Mr. Rivera is such that I don't believe that my representation

15

of my client would have been the same had I not—or had []Rivera not passed or not been available had I known that from the start of the trial. I believe that there's been references to []Rivera. Many of my cross-examinations of witnesses have been directed at impeaching the veracity of []Rivera. Had []Rivera testified, of course, . . . my strategy for trial would have been directed towards impeaching him.

"At this point, though, Your Honor, with that huge change in circumstance that has made it to where I feel that I haven't presented the proper defense for my client. I have no third[-]party culpability defense to present because it was anticipated that []Rivera would testify. My cross-examinations were not directed towards establishing a third[-]party culpability defense. My opening statement spoke about []Rivera and the Plea Agreement quite extensively relying on that []Rivera would be testifying.

"So . . . I believe it's necessary for me to move the Court for a mistrial so that [Phil] starts with a fresh, clean slate in the trial . . . with counsel, who could very well be me, that is prepared to present a defense that would be directed towards a state of facts that do not include the testimony of—proposed testimony of []Rivera. And based upon that I'm moving the Court for a mistrial." Luna and Ruben did not join in the motion.

The prosecution objected to the timing of the motion. The prosecution also argued there had been a number of attempts to eliminate Rivera as a witness, and there had always been the possibility that he would not testify.

The court noted it was the "very last day of a multi-month trial, the very last day of evidence it appears," and agreed with the prosecution that the motion should have been brought sooner. Nonetheless, the court acknowledged "that the concepts of fairness and due process are of the utmost importance." The court denied the motion: "Given the totality of circumstances, I don't believe the interests of justice are well served. I think the trial has run quite smoothly, substantial efforts were made at the outset of the trial by all the defendants to exclude Rivera. So I'm surprised by the motion now. It seems inconsistent with . . . the very strenuous efforts to exclude Rivera. I received the

16

impression from all of the argument and briefing that the defendants perceived Rivera to be perhaps the most damaging witness against them and that his unavailability for trial would actually be helpful to the defendants collectively. So I really don't see any significant prejudice to Phil[] by Rivera's absence in the trial."

### 2. Analysis

" 'A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court's ruling denying a mistrial.' " (*People v. Clark* (2011) 52 Cal.4th 856, 990.) "Whether a particular incident is so prejudicial that it warrants a mistrial 'requires a nuanced, fact-based analysis,' which is best performed by the trial court." (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094.)

"In this case, the evidence before the trial court when it ruled on the mistrial motion[] provided no basis on which to conclude that defendant's chance of receiving a fair trial had been irreparably damaged by" the death of Rivera. (*People v. Clark*, *supra*, 52 Cal.4th at p. 990.) The fact that counsel's representation would not have been the same without Rivera's death or that some of counsel's efforts were unnecessary does not mean that Phil's chance of receiving a fair trial had been irreparably damaged. With Rivera's death, evidence that contradicted Phil's defense and some evidence that supported his defense became unavailable. But we are not persuaded there is a prejudicial difference between the defense that was presented and the defense counsel would have presented if he had known of Rivera's death earlier. Either way, the evidence that Rivera was one of the perpetrators was overwhelming. Phil's defense was, as he testified, that he had no role in any of the offenses. The trial court appears to have reasonably found that Phil was better off for Rivera's mid-trial absence. The court did not abuse its discretion in denying Phil's motion for a mistrial.

Phil's ineffective assistance of counsel argument is not based on the actions of his own counsel but the fact that "[g]*overnment* violates the right to effective assistance

17

when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 686, italics added.) We disagree with the assertion that the trial court's ruling violated Phil's right to effective assistance of counsel in this respect. The trial court's ruling did not prevent Phil's trial counsel from rendering effective assistance.

C.      *Evidence of Rivera's Prior Statements and Character for Violence*

1.      *Trial Court Proceedings*

In addition to moving in limine to exclude Rivera's testimony, Phil's counsel moved in limine to allow testimony from three inmates to whom Rivera had confessed. Specifically, the motion indicated Rivera stated that he slit Bradley's throat after he made disparaging comments about Rivera's earrings. Attached to the motion were summaries of the investigator's conversations with the potential witnesses, which also included additional statements that Phil now refers to on appeal. One of the inmates stated that "Rivera had told him that marijuana goes for a lot more in New York so Rivera and [Martinez] were looking at robbing some grows and sending the marijuana to New York to sell. Rivera told [the inmate] that he had hooked up with some girl in Yuba City on Facebook. This girl knew of a marijuana grow outside of Yuba City and helped Rivera set up the robbery of the marijuana grow." The same inmate indicated Rivera went to Bradley's house with Ruben, Luna, and Martinez to smoke marijuana.

Phil's trial counsel also moved in limine to admit evidence that Rivera was violent in prison.

The court granted both motions. With respect to the testimony regarding Rivera's confessions, the court indicated its ruling was tentative until it heard Rivera's testimony.

Following Rivera's death, but before Phil moved for a mistrial, the prosecution moved to exclude evidence that Bradley was a confrontational person and that Rivera had been violent while in custody. Phil's counsel argued in opposition, "Character evidence of the victim is not inadmissible if offered to show conformance to that character trait."

18

Further, Rivera's "character trait for gratuitous and impulsive violent reactions is also admissible because it also explains why [Rivera] brutally attacked and later killed" Bradley.

In considering the motion, the court stated, "I don't mean to question defense strategy, that's entire[ly] up to you, but I can't help but think, you know, there can be certain dangerous . . . backfire . . . in introducing that kind of evidence. . . . Rivera, clearly the evidence shows he's associated with all three of the defendants in the case. They're together before and after the incident. And you really want to make him out to be a—to use some form or degree 'brutal killer.' Isn't there some danger about the jury associating that character with your client's?" Phil's trial counsel acknowledged that without Bradley's character evidence being admitted, he did not see any purpose in introducing Rivera's character for impulsive violence. The trial court granted the prosecution's motion.

### 2. *No Ineffective Assistance of Counsel*

On appeal, Phil argues that the fact his trial counsel did not reoffer all of the evidence he originally submitted with his motion in limine constituted ineffective assistance of counsel.[8] He argues there can be no satisfactory explanation for counsel's choice. We disagree.

To prevail on such claims, Phil "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice. [Citation.] Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) "In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective

---

[8] Luna joined in this argument.

assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.)

With respect to the evidence regarding Rivera's violence in jail, we agree with the trial court's suggestion that this evidence could cut two ways. The jury could use it to support the theory that Rivera acted independently. Or, if it already believed that Phil fully embraced Rivera's conduct (as suggested by the video taken after Bradley's murder), it would help support the prosecution's charges. Thus, we cannot conclude on direct appeal that counsel did not have a reasonable tactical basis for not pursuing the admission of this evidence.

With respect to the other evidence, putting aside the question of admissibility, we note that the prosecution did not specifically move to exclude this evidence. Phil's trial counsel may have had other reasons for not introducing evidence from the inmates. It does not appear that they testified in this case at all. While the statements Phil isolates may have been generally relevant to his theory that Rivera acted alone, Rivera had given different versions of the events and counsel may have deemed the witnesses or the testimony not worth the risk that they would lead to the introduction of further statements that implicated Phil. Again, we cannot conclude on direct appeal that counsel did not have a reasonable tactical basis for not introducing this evidence.

We reject Phil's assertion that his trial counsel was ineffective for not reoffering all of the evidence he originally submitted with his motion in limine.

## D.     *Senate Bill No. 1437*

Phil, Ruben, and Luna argue their convictions for murder must be reversed because the jury was permitted to and did convict them under the felony murder rule without making additional findings that are now required by Senate Bill No. 1437, which was enacted while their appeal was pending.

20

Section 189, subdivision (a) generally provides that a murder committed during the perpetration or attempt to perpetrate certain felonies is first-degree murder. As relevant to these proceedings, these felonies include robbery and burglary.

Senate Bill No. 1437 was enacted "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) To accomplish this, Senate Bill No. 1437 amended section 188 to provide: "Except as stated in subdivision (e) of [s]ection 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

Section 189, subdivision (e) was added by Senate Bill No. 1437 and provides that a participant in a felony specified in subdivision (a) is liable for murder for a death during the commission of the offense only if one of the following is proven: "(1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2." Thus, "the standard under section 189, subdivision (e)(3) for holding a defendant liable for felony murder is [now] the same as the standard for finding a special circumstance under section 190.2[, subdivision ](d), as the former provision expressly incorporates the latter." (*In re Taylor* (2019) 34 Cal.App.5th 543, 561.) Senate Bill No. 1437 also added section 1170.95, which allows those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts

21

when all of the following conditions apply: [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of first or second degree murder following a trial . . . . [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a).)

If an order to show cause is warranted, the court "hold[s] a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts . . . ." (§ 1170.95, subd. (d)(1).) "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. . . . The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (*Id*., subd. (d)(3).)

Here, defendants were charged with murder and the information alleged the special circumstances that the murder was committed during the commission or attempted commission of robbery and burglary. (§ 190.2, subd. (a)(17)(A), (G).) During the instructions discussion, the prosecution dismissed these special circumstance allegations. As a result, the jury instructions permitted defendants to be convicted of first-degree murder under the felony murder rule as it existed at the time of the trial court proceedings and the jury was not asked to find that any of the defendants were the actual killer, intended to kill, or were a major participant who acted with reckless indifference to human life.

Defendants' assertion that we may reverse their convictions on direct appeal relies in part on *In re Estrada* (1965) 63 Cal.2d 740, which "supports an important, contextually specific qualification to the ordinary presumption that statutes operate prospectively: When the Legislature has amended a statute to reduce the punishment for

22

a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted.) "Senate Bill 1437 is not silent on the question of retroactivity. Rather, it provides retroactivity rules in section 1170.95. The petitioning procedure specified in that section applies to persons who have been convicted of felony murder or murder under a natural and probable consequences theory. It creates a special mechanism that allows those persons to file a petition in the sentencing court seeking vacatur of their conviction and resentencing. In doing so, section 1170.95 does not distinguish between persons whose sentences are final and those whose sentences are not. That the Legislature specifically created this mechanism, which facially applies to both final and nonfinal convictions, is a significant indication Senate Bill 1437 should not be applied retroactively to nonfinal convictions on direct appeal." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 727.) "Section 1170.95's allowance for the presentation of new evidence to demonstrate whether a petitioner is eligible for relief is further evidence the Legislature did not intend to make relief eligible on direct appeal, as appellate courts are not equipped to accept new evidence and make factual findings. It is clear the Legislature did not make entitlement to relief automatic. They intended it to depend on factual findings made by trial courts." (*People v. Cervantes* (2020) 46 Cal.App.5th 213, 224.) Whether defendants are entitled to relief under Senate Bill No. 1437 must be considered in the first instance by the sentencing court pursuant to the procedures provided in section 1170.95. (*People v. Anthony* (2019) 32 Cal.App.5th 1102, 1147, 1158; *People v. Martinez, supra*, at p. 729.) We reject defendants' arguments urging this court to conclude *People v. Anthony, supra*, 32 Cal.App.5th 1102 and *People v. Martinez, supra*, 31 Cal.App.5th 719, were wrongly decided. Nor do we find them distinguishable on the basis of the potential strength of defendants' future petitions or the odds the prosecution would introduce new evidence at a hearing on their petitions. Whether we

believe defendants would ultimately be entitled to relief on their petitions for resentencing is irrelevant; we are not authorized to grant it on direct appeal.

Defendants further contend that requiring them to utilize the petitioning procedure would violate the Sixth Amendment. "Under the Sixth Amendment, any fact other than the fact of a prior conviction that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." (*People v. Perez* (2018) 4 Cal.5th 1055, 1063.) Defendants assert that the facts at issue in Senate Bill No. 1437 increase a sentence. This is untrue as to defendants because they were convicted prior to the passage of the legislation. Rather, as to them, under the procedures outlined in section 1170.95, the court determines whether a defendant may be resentenced and thereby receive an equal or lesser sentence. (See § 1170.95, subd. (d)(1).) "[A] factual finding that results in resentencing ineligibility does not increase the petitioner's sentence; it simply leaves the original sentence intact." (*Perez*, *supra*, at p. 1064.) Defendants' "argument is unpersuasive because the retroactive relief they are afforded by Senate Bill 1437 is not subject to Sixth Amendment analysis. Rather, the Legislature's changes constituted an act of lenity that does not implicate defendants' Sixth Amendment rights." (*People v. Anthony*, *supra*, 32 Cal.App.5th at p. 1156.)

Defendants' contentions based on Senate Bill No. 1437 are without merit.

E. *Phil's Alleged Instructional Errors*

Phil raises multiple claims of instructional error. The People assert forfeiture.

We shall begin by discussing the two claims of instructional error raised in Phil's opening brief, in which he contends certain instructions given by the trial lowered the prosecution's burden of proof. "Because [Phil]'s contentions raise issues concerning his substantial rights, we address them despite his failure to object below." (*People v. Lewis* (2009) 46 Cal.4th 1255, 1315, fn. 43.) " ' " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " ' " (*People v. Young* (2005) 34 Cal.4th

1149, 1202.) " 'If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' " (*Ibid.*)

### 1. CALCRIM No. 301

The court instructed the jury with former CALCRIM No. 301 that "[e]xcept for the testimony of Phil[], which requires supporting evidence if you decide he is an accomplice, the testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."[9] The trial court also instructed the jury pursuant to CALCRIM No. 334 that if it found Phil was an accomplice, it could rely on his testimony to convict a defendant only if his testimony was supported by other evidence that tended to connect a defendant to the crime.

Phil contends the trial court violated his right to present a defense and to proof beyond a reasonable doubt by telling jurors that his testimony required supporting evidence to prove any fact at issue. We disagree.

"A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ." (§ 1111.) The instructions, taken as a whole, correctly informed the jury that corroboration of an accomplice's testimony was necessary only to use that testimony to convict defendant.

In the challenged instruction, the court informed the jury that "[e]xcept for the testimony of Phil[], *which requires supporting evidence if you decide he is an*

---

[9] CALCRIM No. 301 was revised in September 2017 and March 2019. It now reads: "[Unless I instruct you otherwise,] (T/the) testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."

25

*accomplice*, the testimony of only one witness can *prove* any fact. Before you conclude that the testimony of one witness *proves* a fact, you should carefully review all the evidence." (Italics added.) Phil's argument ignores the fact that, as the jury was instructed, "[a] defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt [¶] . . . [¶] Unless the evidence proves the defendant guilty beyond a reasonable doubt, the Defendants are entitled to an acquittal and you must find them not guilty." (CALCRIM No. 103.) In other words, defendants did not have to prove anything to obtain an acquittal. Informing the jury that Phil's testimony, if the jury determined he was an accomplice, required supporting evidence to *prove* a fact was properly qualified and correct. (Compare with *People v. Smith* (2017) 12 Cal.App.5th 766, 780 [jury instructed " '[t]he testimony of any other person you determine to be an accomplice also requires supporting evidence,' without further explanation that this instruction applies only when such testimony is being used to determine a fact used to *convict* a defendant"].) To the extent, however, that this point was too subtle, the statement "if you decide he is an accomplice" implicitly referenced the subsequent instructions in CALCRIM No. 334, which further and more clearly explained that if the jury found Phil was an accomplice, it could rely on his testimony to *convict* a defendant only if his testimony was supported by other evidence that tended to connect a defendant to the crime. On the record before us, there is no reasonable likelihood the jury misapplied CALCRIM No. 301.

Nor are we convinced by Phil's argument that any potential ambiguity in CALCRIM No. 301, as given, is comparable to the clearly erroneous instruction in *Cool v. U.S.* (1972) 409 U.S. 100. In *Cool*, "[a]fter first defining the word 'accomplice' and warning that an accomplice's testimony is 'open to suspicion,' the judge made the following statement: 'However, I charge you that the testimony of an accomplice is competent evidence and it is for you to pass upon the credibility thereof. If the testimony

26

carries conviction and you are convinced it is true *beyond a reasonable doubt*, the jury should give it the same effect as you would to a witness not in any respect implicated in the alleged crime and you are not only justified, but it is your duty, not to throw this testimony out because it comes from a tainted source.' (Emphasis added.) [¶] The clear implication of this instruction was that the jury should disregard [the alleged accomplice's] testimony unless it was 'convinced it is true beyond a reasonable doubt.' " (*Id*. at p. 102.) Here, the jury was not instructed to disregard exculpatory evidence unless it was supported. Nor did the instructions reduce the prosecution's burden of proof. Phil's claim of instructional error regarding CALCRIM No. 301 is without merit.

      2.     *CALCRIM No. 359*

The trial court instructed the jury pursuant to CALCRIM No. 359 as follows:

"The defendant may not be convicted of any crime based on his out-of-court statements alone. You may rely on the defendant's out-of-court statements to convict him only if you first conclude that other evidence shows that the charged crime was committed.

"That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.

"This requirement of other evidence does not apply to proving the identity of the person who committed the crime and the degree of the crime. If other evidence shows that the charged crime was committed, *the identity of the person who committed it and the degree of the crime may be proved by the defendant's statements alone*.

"You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt." (Italics added.)

Citing the Sixth District Court of Appeal's decision in *People v. Rivas* (2013) 214 Cal.App.4th 1410 (*Rivas*), Phil argues the italicized portion of this instruction undercut the presumption of innocence. He asserts that because his statements alone were insufficient to prove he committed the October 25, 2015 offenses or was a co-conspirator,

27

it was reasonably likely the jury believed the prosecution did not have to prove beyond a reasonable doubt that he was. We disagree.

"The corpus delicti rule requires some evidence that a crime occurred, independent of the defendant's own statements." (*People v. Ledesma* (2006) 39 Cal.4th 641, 721.) It is undisputed that the first two paragraphs of the trial court's instruction correctly state the corpus delicti rule. (See *Rivas, supra*, 214 Cal.App.4th at p. 1428.) The dispute here concerns the third paragraph of the instruction and the principle that "the corpus delicti rule does not require independent proof that the defendant is the perpetrator of the crime." (*Ledesma*, *supra*, at p. 721.)

The trial court in *Rivas* instructed the jury with an earlier version of CALCRIM No. 359 that stated in the third paragraph, " 'The identity of the person who committed the crime [and the degree of the crime] may be proved by the defendant's statement[s] alone.' " (*Rivas, supra*, 214 Cal.App.4th at 1428, fn. 5.) The *Rivas* court held this "identity" paragraph "requires reconsideration" because it "presents a risk of confounding the jury by telling jurors that a defendant's inculpatory extrajudicial statements, taken alone, do not suffice to allow the jury to convict the defendant of a charged crime—and yet those statements, again taken alone, are entertainable to prove the defendant's 'identity [as] the person who committed the crime' [citation], which to any juror can only mean the defendant's identity as the perpetrator, i.e., the guilty party." (*Id*. at p. 1429.) In so concluding, the *Rivas* court distinguished this "identity" wording as "quite different" from the instruction our Supreme Court upheld in *People v. Foster* (2010) 50 Cal.4th 1301. (*Rivas, supra*, at p. 1429, fn. 8.) The jury in *Foster* was instructed that " '[t]he identity of the person who is alleged to have committed a crime is not an element of the crime nor is the degree of the crime. Such identity or degree of the crime may be established by an admission.' " (*Foster, supra*, at p. 1344, fn. 19, italics omitted.)

In *People v. Rosales* (2014) 222 Cal.App.4th 1254, Division Five of the Second District Court of Appeal disagreed with *Rivas*, and held the "identity" language in former

CALCRIM No. 359 correctly stated the law and created no reasonable likelihood of juror confusion. (*Rosales*, *supra*, at pp. 1260-1261.)

We need not take any stand on the matter because the trial court here instructed the jury with a different version of CALCRIM No. 359 than was used in those cases—a version that was revised in response to *Rivas*. (Judicial Council of Cal., Crim. Jury Instns. (2019) Bench Notes to CALCRIM No. 359, p. 126.) This version correctly states the law and is more akin to the instruction our Supreme Court upheld in *Foster* than to the earlier revision of CALCRIM No. 359 questioned in *Rivas* and upheld in *Rosales*. Accordingly, we conclude the trial court properly instructed the jury regarding the law, and did so in a way that was not likely to confuse jurors.

We likewise reject Phil's contention that, on these facts, the instruction gave the jurors an impermissible shortcut to conviction that undercut the prosecution's burden of proof. The court correctly instructed the jury on the parameters of the corpus delicti rule and the instruction ended by highlighting the fact that the prosecution had to prove Phil committed the crimes beyond a reasonable doubt.

### 3.    *CALCRIM No. 315*

In his original supplemental briefing and again after transfer from our Supreme Court, Phil argues instructing the jury with CALCRIM No. 315 violated his right to due process. CALCRIM No. 315 instructs the jury to consider various questions in deciding whether an eyewitness "gave truthful and accurate testimony," including, "How certain was the witness when he or she made an identification?"[10] As in *Lemcke*, Phil's claim is based on research that shows witness certainty is not a reliable indicator of accuracy and

---

[10] Subsequent to defendants' trial, our Supreme Court in *Lemcke*, acting pursuant to its supervisory powers, "direct[ed] . . . trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point." (*Lemcke*, *supra*, 11 Cal.5th at p. 669.)

yet it is the most influential factor in juror determinations of accuracy. (See *Lemcke, supra*, 11 Cal.5th at pp. 655, 665-666.) Because defense counsel did not object to the instruction or request any modification to the witness certainty language, the People contend Phil forfeited his claim. Phil argues the issue is preserved because any objection would have been futile and the error affects his substantial rights. Alternatively, he asserts ineffective assistance of counsel.

Even assuming Phil's claim is preserved, we reject it nonetheless based on *Lemcke, supra*, 11 Cal.5th 644. In *Lemcke*, our Supreme Court rejected an argument that CALCRIM No. 315 lowered the prosecution's burden of proof and denied the defendant a meaningful opportunity to present a defense. (*Lemcke, supra,* at pp. 657, 661.) Phil raises the same arguments and, for the reasons set forth in *Lemcke*, we must reject them.

"[N]othing in CALCRIM No. 315's instruction on witness certainty . . . operates to 'lower the prosecution's burden of proof.' " (*Lemcke, supra*, 11 Cal.5th at p. 657.) The instruction did not expressly equate certainty with accuracy. (*Ibid*.) In *Lemcke*, our Supreme Court stated that "[a]lthough the wording of the instruction might cause some jurors to infer that certainty is generally correlative of accuracy [citation], [the defendant] was permitted to present expert witness testimony to combat that inference." (*Id.* at pp. 657-658.) There, the expert had testified that the only time certainty may be useful in assessing accuracy is when the identification is made close in time and law enforcement has utilized nonsuggestive procedures. (*Id.* at p. 658.) The expert also indicated in-trial identification is particularly meaningless and testified regarding procedures law enforcement should follow to ensure an accurate identification. (*Ibid*.) Phil argues that absent the type of expert testimony presented in *Lemcke*, the certainty instruction lowered the prosecution's burden of proof at his trial by allowing jurors to rely on certainty to find eyewitness identification reliable. He asserts on transfer, and the People agree, that the jurors did not hear from an eyewitness identification expert. Phil and the People are mistaken. As we indicated in footnote 7 *ante*, Phil offered testimony from an expert on

30

these issues. She began by describing three aspects of the problem with eyewitness testimony. First, she explained about 75 percent of all cases in which someone was later exonerated by DNA evidence involved at least one mistaken eyewitness. Second, she stated that "some studies have shown that just a single confident eyewitness is enough to get over 80 percent of people convicted in the absence of any other evidence. So people believe that eye witnesses are correct." Third, she explained that sometimes eye witnesses are correct "and other times they're very incorrect," depending on the circumstances. The expert's extensive testimony regarding circumstances that make eyewitness testimony unreliable and law enforcement procedures that influence witness accuracy only touched on the specific issue of witness certainty tangentially. For instance, she explained that "when you ask people if they think they'll be able to identify someone correctly, [their] predictions about whether they can or can't, are less accurate when it comes to a different race person. If they say, yes, I can identify them, that doesn't predict them actually identifying them correctly as well as it does if it's their same race." She explained that we think our memory is better than it actually is. She also testified witnesses who talk with one another and agree become more certain even if they are wrong. She testified regarding false memories and that people can honestly believe what they are saying is true even when it is wrong. Even if it was only indirectly, the expert's testimony combatted the notion that the jury should assume certainty correlates with accuracy or place outsized importance on that factor. The jury was instructed with CALCRIM No. 332 that it "must consider the opinion" of the expert. (*Lemcke, supra*, at p. 658.)

Moreover, the court's other instructions undercut any argument that the certainty instruction lowered the People's burden of proof. (*Lemcke*, *supra*, 11 Cal.5th at p. 658.) The court instructed the jurors that Phil was presumed innocent and the People had the burden of proving guilt beyond a reasonable doubt (CALCRIM No. 220). (*Lemcke, supra*, at p. 658.) And the court instructed the jurors that "[p]eople sometimes honestly

31

. . . make mistakes about what they remember" (CALCRIM No. 226), that the jurors were responsible for "judg[ing] the credibility or believability of the witnesses," and that the People had "the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime" (CALCRIM No. 315). (*Lemcke, supra,* at p. 658.) As such, CALCRIM No. 315 did not lower the burden of proof. (*Lemcke, supra*, at p. 658.)

As in *Lemcke*, we must also reject the assertion that the instruction denied Phil a meaningful opportunity to present a defense. (*Lemcke*, *supra*, 11 Cal.5th at p. 660.) He was "permitted to put on a vigorous defense on the issue of identity." (*Ibid*.) As we have explained, Phil called an expert who testified at length about the problems with eyewitness testimony and photo lineups. Phil's counsel emphasized that testimony during closing argument, explaining: "[T]hat's why we have [CALCRIM No.] 315 because eyewitness identification is powerful. When you see somebody point somebody out in a courtroom, it's convincing. That's our nature. We say if somebody says, hey, they did it, we believe, yeah, they did it. But there is a lot going on in a person's mind and there's a lot of influences that can mold a person's memory of what happened and that's what [the expert] told us and that's exactly what happened in our case." Additionally, as we discussed in Part II.A.2, Phil had an opportunity to cross-examine the witnesses to the October 25 robbery that he claims identified him with certainty as to the basis for their identifications. (*Id*. at p. 660.) His counsel also cross-examined the investigator for the Redding Police Department regarding these witnesses' identifications. (*Ibid*.) Accordingly, the eyewitness certainty instruction did not render Phil's trial fundamentally unfair or otherwise violate his due process rights. (*Id*. at p. 661.)

Phil has failed to meaningful distinguish his assertions from those rejected in *Lemcke*.

As such, Phil's claims of instructional error are without merit.

32

*F.      Sufficiency of the Evidence*

Defendants challenge the sufficiency of the evidence to support various counts. " 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]  [¶]  The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence . . . .  "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.]  We do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)

*1.      Count 14 (Robbery of Michael's Mother)*

Phil challenges the sufficiency of the evidence to convict him of the robbery of Michael's mother in count 14.  His argument is based on the fact that Michael's father testified that he did not believe any of his wife's property was taken.

"A person from whose immediate presence property was taken by force or fear is not a robbery victim unless, additionally, he or she was in some sense in possession of the property." (*People v. Scott* (2009) 45 Cal.4th 743, 749.)  "[N]either ownership nor physical possession is required" and constructive possession is sufficient. (*Ibid.*)  "Two or more persons may be in joint constructive possession of a single item of personal property, and multiple convictions of robbery are proper if force or fear is applied to multiple victims in joint possession of the property taken." (*Id*. at p. 750.)  "For constructive possession, courts have required that the alleged victim of a robbery have a 'special relationship' with the owner of the property such that the victim had authority or

33

responsibility to protect the stolen property on behalf of the owner." (*Ibid*.) The victim need not "have general authority to control the owner's property in other circumstances." (*Id*. at pp. 753-754.) "A special relationship may include close relatives who live in the same household or visit frequently." (*People v. Hutchinson* (2018) 20 Cal.App.5th 539, 547; see, e.g., *People v. Weddles* (2010) 184 Cal.App.4th 1365, 1370 [owner's brother]; *People v. Gordon* (1982) 136 Cal.App.3d 519, 529 [owner's parents].)

Here, Michael lived with his mother and father. All three were present for the robbery. Michael testified that his marijuana was taken. His father testified that a laptop, iPad, and a chainsaw were taken from him. The evidence was sufficient to convict Phil of robbery against Michael's mother because she was robbed of property over which she had constructive possession.

### 2. Count 31 (Unlawful Taking or Driving of Larry's Van)

Defendants argue the evidence was insufficient to convict them of the unlawful driving or taking of Larry's van in count 31. Vehicle Code section 10851, subdivision (a) provides: "Any person who drives or takes a vehicle not his or her own, without the consent of the owner thereof, and with intent either to permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle, whether with or without intent to steal the vehicle, . . . is guilty of a public offense . . . ." "The language of the statute places the burden on the People to show by direct or circumstantial evidence the defendant lacked the consent of the owner." (*People v. Clifton* (1985) 171 Cal.App.3d 195, 199.)

At trial, the relevant evidence was introduced through John's testimony. John testified that Luna drove him in a U-Haul to a hardware store to meet Larry while Ruben went in a truck. Phil arrived in a car with three other people. Larry arrived in his van. Larry and John talked before Larry "went and talked with them" and then returned to John. John explained that Larry's van left, and then John, Larry, and Luna got into the U-Haul. The U-Haul was "the last vehicle that left." John testified Larry's demeanor

was "[c]onfused." John also explained that when they left, he did not know where they were going, but when they arrived at the hydroponics store, he recalled a conversation from a few days earlier about obtaining soil. Meanwhile, Larry "looked really confused."

Defendants argue the evidence was insufficient to convict them of count 31 because Larry was not called as a witness and the testimony merely indicated he was confused. They also note no evidence was produced that his van was started without the key or that the key was taken involuntarily. The People contend the facts "permit a reasonable inference that [Larry] did not consent to the taking of his van—had he consented, he would not have been confused when someone drove off in it." Defendants have the better argument. "Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence; it merely raises a possibility, and this is not a sufficient basis for an inference of fact." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) The testimony did not specify why Larry was confused, and it would be speculation to infer Larry's confusion was because his van was taken without his consent rather than for another reason, such as a general confusion over what was happening. Because the evidence raised no more than a suspicion of defendants' guilt as to count 31, we will reverse this count and direct the trial court to dismiss it on remand.

### 3. *Conspiracy to Commit Robbery*

As set forth above, defendants were convicted of four counts of conspiracy to commit robbery (counts 2, 7, 21, and 32). Ruben argues his conviction for conspiracy in count 2 relating to the robbery of Bradley was not supported by sufficient evidence, and his convictions for counts 3 through 6 should also be reversed because they were likely based on his liability as a co-conspirator. Luna filed a notice of joinder with respect to Ruben's arguments, but also argued there was insufficient evidence to show he participated in any of the alleged conspiracies. Phil does not contest the sufficiency of the evidence regarding count 7, but otherwise joined in Luna's and Ruben's arguments.

35

" ' "Conspiracy requires two or more persons agreeing to commit a crime, along with the commission of an overt act, by at least one of these parties, in furtherance of the conspiracy." ' [Citation.] ' "Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " ' " (*People v. Beck & Cruz* (2019) 8 Cal.5th 548, 627.) In other words, while each conspiracy must be proved individually, we do not disregard the context or evidence relating to other conspiracies in determining whether each conspiracy is proven. " 'Mere association does not make a conspiracy. There must be evidence of some participation or interest in the commission of the offense.' [Citations.] Where there is some evidence of participation or interest in the commission of the offense, it, when taken with evidence of association, may support an inference of a conspiracy to commit the offense." (*People v. Hardeman* (1966) 244 Cal.App.2d 1, 41.) Defendants essentially argue they were convicted of each conspiracy based on mere association and presence. We conclude the evidence was sufficient to establish that their presence at or near the location of each crime was due to an agreement to commit each robbery.

### a. Count 32 (B.T.'s Residence)

After Rivera and Martinez first approached B.T.'s residence, and before they attempted to rob him, B.T. saw Luna and Ruben stopped in a second vehicle nearby. They drove away and did not help B.T. Ruben had previously been to B.T.'s residence to buy marijuana. Phil, who had just finished driving from New York with Rivera and Martinez, was also in the area. We do not assume the jury credited Phil's suggestion that he was asleep elsewhere while his phone was in the car. We also note Rivera and Martinez were in a car owned by John that he had given Luna and Ruben permission to borrow. Under the circumstances, it was reasonable for the jury to infer that all of the

36

defendants conspired to rob B.T., and their presence at and near B.T.'s house was intentional and part of an agreement to rob.

### b. Count 2 (Bradley's Residence)

Two days later, Bradley was killed during an apparent attempted robbery. The prosecution's investigator testified that his report indicated Bradley's time of death was likely between 2:15 p.m. and 4 p.m. The fact defendants' phones were in this area during only some of this window does not negate the reasonable inference that they were there together at the time of the attempted robbery and not nearby for some other purpose. Bradley also grew marijuana at his residence and knew Ruben, who had recently seen him purchase a $CO_2$ tank at the used grow equipment store. In other words, he was a similar target to B.T. Given the robbery attempt resulted in Bradley's death, it is not dispositive that defendants left behind at least some of Bradley's marijuana. Again, it was reasonable for the jury to infer that all of the defendants conspired to rob Bradley, and their presence at and near his house was intentional and reflective of this conspiracy.

### c. Count 7 (Michael's Residence)

With respect to the October 25 crimes, both Ruben and Phil were identified as intruders. Additionally, cell phone records put each of the defendants near Michael's residence. Phil had previously been to Michael's house asking to buy marijuana. Thus, Michael was a similar target to Bradley and B.T. At Michael's residence, defendants removed tubs of marijuana. John testified that he saw Luna and Ruben driving the U-Haul with containers of marijuana on the night of this robbery or "maybe" the night before. It was reasonable for the jury to infer that defendants conspired to rob Michael's residence, and their presence at and near Michael's residence was reflective of this conspiracy.

### d. Count 21 (Hydroponics Store)

It is significant that B.T., defendants' first target, worked at the hydroponics store, their last target. Luna argues the evidence was that he went to the store to pick up soil

and not facilitate the robbery because he did nothing to facilitate the robbery while he was there. Again, the evidence suggests Luna's presence was purposeful and indicative of his role in the conspiracy. When John told Luna he wanted to leave because there was a raid going on, Luna stayed, claiming a need to obtain soil, while John and Larry left. As he left, John saw what looked like one of the men who had been at the hardware store with a gun on his hip and leading another man out to the van.

John testified that, after the robbery, Luna seemed confused and said he did not know what was going on. John said Ruben did not clearly tell him what happened but indicated "that wasn't supposed to happen." Nonetheless, the confusion could have easily referred to the inclusion of John and Larry in the latest robbery. Moreover, the evidence demonstrated that, at this point, defendants had conspired to commit three previous robberies together, including one the previous day that also involved impersonating DEA agents. It would be reasonable for a jury to infer that defendants' joint presence and efforts at the hydroponics store were evidence of an additional agreement to rob, rather than happenstance or an uncoordinated effort.

Substantial evidence supports defendants' conspiracy convictions. We therefore reject their arguments related thereto.

G.      *Kidnapping to Commit Robbery (Counts 8 and 9)*

        1.      *Trial Court Proceedings*

Defendants' convictions for kidnapping to commit robbery (§ 209, subd. (b)) in counts 8 and 9 were based on the victims Robert and Joe, respectively. Robert testified that he lives "in a smaller house next to the big house," and while he and Joe were processing marijuana, Ruben and other men entered, threw Robert on the ground, and put a gun to his head. After 15 or 20 minutes of these intruders removing tubs of marijuana and tearing Robert's house apart with their search, Robert and Joe were taken to Michael's house by gunpoint and told to sit quietly with everyone else. It was another 30

38

or 40 minutes before the intruders left.  The distance between the two homes is 20 or 25 feet, which includes a carport.

The jury was instructed on principles of aiding and abetting and that it could find defendants guilty of counts 8 and 9 by finding they were guilty of the target offense of conspiracy to commit robbery, residential robbery in concert, or second-degree robbery, and, during the commission of the offense, a coparticipant committed the nontarget offense of kidnapping for robbery and, under the circumstances, a reasonable person in their position would have known the commission of kidnapping for robbery was a natural and probable consequence of the target offense.  The jury was similarly instructed that a member of a conspiracy to commit robbery is guilty of a kidnapping for robbery committed by a co-conspirator if it was "a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit."  No instructions on lesser included offenses were requested or given.  At one point, the court said it wanted to confirm with counsel that no lesser included offenses were factually indicated.  Counsel for Luna and Phil indicated they agreed.

2. *Lesser Included Offenses*

On appeal, Ruben argues his convictions for counts 8 and 9 should be reversed because the trial court had a duty to instruct sua sponte on false imprisonment as a lesser included offense.[11]

"The trial court must instruct on general legal principles closely related to the case. This duty extends to necessarily included offenses when the evidence raises a question as to whether all the elements of the charged offense are present."  (*People v. DePriest* (2007) 42 Cal.4th 1, 50.)  "Nevertheless, 'the existence of "*any* evidence, no matter how weak," will not justify instructions on a lesser included offense . . . .'  [Citation.]  Such

---

[11]  Phil joined in this argument.

39

instructions are required only where there is 'substantial evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense." (*Ibid*.)

The parties agree false imprisonment is a lesser included offense of kidnapping to commit robbery. (See *People v. Chacon* (1995) 37 Cal.App.4th 52, 65 [false imprisonment is a lesser included offense of kidnapping for ransom].) "False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.) "No asportation is required. '[K]idnapping, be it simple or aggravated, requires a degree of asportation not found in the definition of false imprisonment. Indeed, false imprisonment can occur with *any* movement or *no* movement at all.' " (*People v. Williams* (2017) 7 Cal.App.5th 644, 672.) Kidnapping for robbery is one form of aggravated kidnapping. Section 209, subdivision (b)(1) provides that "[a]ny person who kidnaps or carries away any individual to commit robbery . . . shall be punished by imprisonment in the state prison for life with the possibility of parole." "[T]he movement of the victim" must be "beyond that merely incidental to the commission of, and increase[] the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(2).) The two elements are related. (*People v. James* (2007) 148 Cal.App.4th 446, 454.) "As to whether the movement was more than merely incidental to the commission of the crime, 'the jury considers the "scope and nature" of the movement, which includes the actual distance a victim is moved.' " (*People v. Simmons* (2015) 233 Cal.App.4th 1458, 1471.) "As to whether the movement increased a victim's risk of harm, the jury considers ' " 'such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased.' " ' " (*Ibid*.)

The People contend the court had no duty to instruct on false imprisonment as a lesser included offense because the evidence did not permit a finding that defendants committed false imprisonment but not kidnapping for robbery. Ruben argues the evidence raised a reasonable doubt regarding whether the movement of Robert and Joe met the additional requirements for a conviction for kidnapping for robbery.

As to whether the movement was more than merely incidental to the commission of the crime, Ruben argues the absolute distance between the houses was not shown to be far. " 'There is, however, no minimum distance a defendant must move a victim to satisfy . . .' this element." (*People v. Simmons*, *supra*, 233 Cal.App.4th at p. 1471.) The scope and nature of the movement involved moving the victims from one house to another. This was a significant movement. While "[t]here is no rigid 'indoor-outdoor' rule by which moving a victim inside the premises in which he is found is *never* sufficient asportation for kidnapping for robbery while moving a victim from inside to outside (or the reverse) is *always* sufficient" (*People v. James*, *supra*, 148 Cal.App.4th at p. 456), " '[m]ost movements that have been found to be . . . merely incidental to the underlying crime have been within a building [citations], or within the premises of a business' " (*People v. Leavel* (2012) 203 Cal.App.4th 823, 834). Here, the perpetrators moved the victims between two houses that formed the basis for separate burglary convictions (counts 15 and 16). Ruben argues the movement was merely incidental in that the robbery was ongoing, and the movement did not increase the risk of harm because Robert and Joe were already held at gunpoint. While the robberies were ongoing, moving Robert and Joe was not necessary to completion of the robberies. The perpetrators did not, for instance, need or use either individual to gain access to the second home or to locate any items within it. Rather, the movement appears to have been made to obtain greater control over the victims and decrease the likelihood of detection. "Lack of necessity is a sufficient basis to conclude a movement is not merely incidental." (*People v. James*, *supra*, at p. 455.) "Standing alone, the fact that the movement of a

41

robbery victim *facilitates* a robbery does not imply that the movement was merely incidental to it. . . . [A] substantial movement made solely to facilitate a robbery is not incidental to it, but an insubstantial facilitating movement would be. Similarly, a movement of the victim that is *necessary* to the robbery might or might not be merely incidental, based on the circumstances." (*Id.* at p. 454.)

We cannot conclude any evidence suggested the movement of Robert and Joe was merely incidental or did not increase the risk of harm to them. Moving them by gunpoint to a second house increased the odds of something going awry because it allowed the perpetrators to hold all the victims of multiple crimes together at once and for a prolonged period while they went through different rooms in Michael's house. (See *People v. Simmons, supra*, 233 Cal.App.4th at p. 1472 [conviction for two counts of aggravated kidnapping amply supported where defendants moved two victims upstairs and into home occupied by others because the movement "allowed the defendants to engage in additional and more dangerous crimes by hiding their victims from public view and providing access to additional victims, and it increased the possibility of something going awry and somebody getting hurt"].) This plainly increased the risk of harm to Robert and Joe. There was no evidence the perpetrators committed the lesser offense of false imprisonment but not the greater offense of kidnapping for robbery.

Additionally, Ruben argues the jury most likely did not convict him as a direct perpetrator but rather under the natural and probable consequences doctrine, and an instruction on the lesser offense of false imprisonment was required because the evidence did not establish that the kidnapping for robbery was a reasonably foreseeable consequence of the target offense. His argument relies on the following principles we articulated in *People v. Woods* (1992) 8 Cal.App.4th 1570, 1593: "Even when lesser offense instructions are not required for the perpetrator because the evidence establishes that, if guilty at all, the perpetrator is guilty of the greater offense, the trial court may have a duty to instruct sua sponte on necessarily included offenses as to aider and abettor

liability. If the evidence raises a question whether the offense charged against the aider and abettor is a reasonably foreseeable consequence of the criminal act originally aided and abetted but would support a finding that a necessarily included offense committed by the perpetrator was such a consequence, the trial court has a duty to instruct sua sponte on the necessarily included offense as part of the jury instructions on aider and abettor liability. . . . [¶] However, the trial court need not instruct on a particular necessarily included offense if the evidence is such that the aider and abettor, if guilty at all, is guilty of something beyond that lesser offense, i.e., if the evidence establishes that a greater offense was a reasonably foreseeable consequence of the criminal act originally contemplated, and no evidence suggests otherwise." The People contend no instruction was required on the lesser offense because it was "foreseeable that the guesthouse intruders would not simply leave [Joe] and Robert behind to escape when they went to the next residence." Indeed, the plan appeared to be to gather all the victims together into one room in Michael's house. Under these circumstances, the court had no duty to instruct on the lesser included offense of false imprisonment as to counts 8 and 9.

To the extent we would conclude the court should have instructed on the lesser included offense based on the issue of foreseeability, such an error " 'must be reviewed for prejudice exclusively under [*People v.*] *Watson* [(1956) 46 Cal.2d 818, 836, 299 P.2d 243]. A conviction of the charged offense may be reversed, in consequence of this form of error only if, "after an examination of the entire cause, including the evidence" [citation], it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the error not occurred.' " (*People v. Blakeley* (2000) 23 Cal.4th 82, 93.) There must be "a *reasonable* probability, not a mere *theoretical* possibility, that the instructional error affected the outcome of the trial." (*Id.* at p. 94.) Even if we assume the jury may not have convicted Ruben as a direct perpetrator of counts 8 and 9, it is not reasonably probable that the same jury that agreed with the prosecution's theory that cutting the phone wires (count 20) was foreseeable would have concluded that the

43

movement between the houses was unforeseeable.  We will not reverse counts 8 and 9 based on Ruben's alleged instructional error.

*H.      Phil's Prior Convictions for Manslaughter in New York*

      *1.      Trial Court Proceedings*

The information alleged Phil suffered two prior manslaughter convictions in New York that qualified as serious felonies under section 667, subdivision (a)(1), and serious or violent felonies under the three strikes law (§ 1170.12).  To prove these allegations, the prosecutor introduced evidence showing Phil was convicted in case No. 03723-90 of manslaughter in the first degree under New York Penal Law section 125.20.  No subdivision was specified.  The evidence also showed he was convicted in case No. 03952-91 of manslaughter in the first degree under subdivision 2 of the same statute. With respect to the latter conviction, the prosecution also introduced an indictment.  The prosecution argued "the subdivision under which [Phil] was convicted is consistent with manslaughter in California which was reduced from a first-degree murder charge."  The court found the prior offense allegations to be true.  Therefore, it used the prior convictions to enhance Phil's current sentence under both the three strikes law and section 667, subdivision (a)(1).  Phil contends his conviction in case No. 03723-90 does not contain all of the elements of a serious or violent felony in California, and he must be resentenced accordingly.

      *2.      Use of Foreign Convictions*

"For criminal sentencing purposes in this state, the term 'serious felony' is a term of art.  Severe consequences can follow if a criminal offender, presently convicted of a felony, is found to have suffered a prior conviction for a serious felony.  If the present conviction is also for a serious felony, the offender is subject to a five-year enhancement term to be served consecutively to the regular sentence." (*People v. Warner* (2006) 39 Cal.4th 548, 552 (*Warner*); see § 667, subd. (a)(1).)  Moreover, a prior conviction for a

44

serious felony also "renders the offender subject to the more severe sentencing provisions of the three strikes law." (*Warner, supra*, at p. 552.)

Whether a crime qualifies as a serious felony is determined by section 1192.7, subdivision (c), which lists and describes qualifying crimes. (*Warner, supra*, 39 Cal.4th at p. 552.) Among those are murder and voluntary manslaughter.[12] (§ 1192.7, subd. (c)(1).) "Under our sentencing laws, foreign convictions may qualify as serious felonies, with all the attendant consequences for sentencing, if they satisfy certain conditions. For a prior felony conviction from another jurisdiction to support a serious-felony sentence enhancement, the out-of-state crime must 'include[] all of the elements of any serious felony' in California. (§ 667, subd. (a)(1).) For an out-of-state conviction to render a criminal offender eligible for sentencing under the three strikes law (§§ 667, subds. (b)-(i), 1170.12), the foreign crime (1) must be such that, 'if committed in California, [it would be] punishable by imprisonment in the state prison' [citations], and (2) must 'include[] all of the elements of the particular felony as defined in' section 1192.7[, subdivision ](c)." (*Warner, supra*, at pp. 552-553.)[13]

"The People must prove each element of an alleged sentence enhancement beyond reasonable doubt." (*People v. Delgado* (2008) 43 Cal.4th 1059, 1065.) Additionally, "if

---

[12] "Manslaughter is 'the unlawful killing of a human being without malice.' (§ 192.) A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"— the unreasonable but good faith belief in having to act in self-defense.' " (*People v. Lasko* (2000) 23 Cal.4th 101, 108.) In other words, "an intentional killing is reduced to voluntary manslaughter if other evidence negates malice." (*People v. Manriquez* (2005) 37 Cal.4th 547, 583.)

[13] "A criminal offender may also be sentenced under the three strikes law if he or she has a prior conviction for a 'violent felony,' as defined in section 667.5, subdivision (c)." (*Warner, supra*, 39 Cal.4th at p. 553, fn. 3.) The People do not contend that the New York conviction at issue qualifies as a violent felony.

the prior conviction was for an offense that can be committed in multiple ways, and the record of the conviction does not disclose how the offense was committed, a court must presume the conviction was for the least serious form of the offense." (*Id*. at p. 1066.)

At the time of Phil's convictions for manslaughter, New York Penal Law section 125.20 set forth four bases for a conviction for manslaughter in the first degree.[14] We need only address the fourth: "Being eighteen years old or more and with intent to cause physical injury to a person less than eleven years old, the defendant recklessly engages in conduct which creates a grave risk of serious physical injury to such person and thereby causes the death of such person." The People argue this theory of manslaughter would constitute implied malice murder in California. We disagree.

The People's argument hinges on a comparison between implied malice murder and *second degree* manslaughter under New York law where a person "recklessly causes the death of another person." (N.Y. Pen. Law, § 125.15(1).) But this argument suffers from a similar problem as the prosecution's original offer of proof: While this type of second-degree manslaughter in New York is a lesser included offense of one type of first-degree manslaughter in New York, it is not a lesser included offense of all of them: "Second-degree manslaughter . . . is not a lesser-included offense of first-degree manslaughter of a person less than 11 years old, even though it is a lesser-included offense of first-degree manslaughter, since it is theoretically possible to commit the crime of first-degree manslaughter of a person less than 11 years old by recklessly engaging in conduct which creates a grave risk of serious physical injury to a person and thereby causes such person's death, without also committing the offense of second-degree manslaughter by recklessly causing the death of another person." (35A N.Y. Jur. 2d

---

[14] The third basis has since been repealed.

Criminal Law: Principles and Offenses § 560, fns. omitted; see also *People v. Leak* (2015) 11 N.Y.S.3d 209, 210.)

Similarly, first-degree manslaughter of a person less than 11 years old under New York law does not necessarily constitute implied malice murder in California. Under California law, "[m]urder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice may be express or implied. (§ 188.) " 'It is implied . . . "when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*People v. Taylor* (2004) 32 Cal.4th 863, 867.) By contrast, first-degree manslaughter as defined in New York Penal Law section 125.20(4) only requires "intent to cause physical injury" and reckless engagement "in conduct which creates a grave risk of serious physical injury to such person and thereby causes the death of such person." Thus, the People have not demonstrated that it contains all the elements of implied malice murder or any other serious felony under California law.

Accordingly, the trial court's determination that Phil's New York manslaughter conviction in case No. 03723-90 was a serious felony and a strike under California law for sentencing purposes was unsupported by substantial evidence. We therefore reverse these findings.

I.      *Section 654*

Defendants argue their sentences for various counts must be stayed under section 654. Section 654, subdivision (a) provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

"Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) " 'Whether a course of

47

criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Correa* (2012) 54 Cal.4th 331, 336.) An implicit determination that there was more than one objective is a factual determination that must be sustained on appeal if it is supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730.)

      1.     *Counts 5 and 6 (Assault with a Firearm and False Imprisonment)*

The trial court sentenced defendants for the murder of Bradley (count 1) and stayed the sentences for conspiracy to commit robbery (count 2), robbery in concert of Bradley (count 3), and first-degree residential burglary (count 4) related to this incident. Defendants argue, and the People concede, that the terms on count 5 for assault with a firearm on Bradley and count 6 for false imprisonment by violence of Bradley should be stayed pursuant to section 654 as well. We accept the People's concession.

Defendants were convicted of murder under a felony murder theory, with the underlying felony being robbery or burglary. (See *People v. Carter* (2019) 34 Cal.App.5th 831, 841 ["Where a defendant is prosecuted *solely* on a theory of first degree felony murder, section 654 precludes punishment for both murder and the underlying felony"].) Though the prosecution's sentencing memorandum later asserted counts 5 and 6 should "not be stayed because there were different objectives in those crimes where the commission of either did not contribute to the victim's death," no argument or evidence presented at trial supported the theory that any defendant had an objective other than stealing Bradley's marijuana. Defendants' sentences for counts 5 and 6 must be stayed.

      2.     *Count 20 (Cutting a Utility Line)*

Ruben argues, and the People concede as to all defendants, that section 654 prohibits separate punishment for conspiracy to commit the October 25, 2015 robbery (count 7) and cutting a utility line during that robbery (count 20). We accept the People's

concession.  No evidence or argument was presented at trial supporting a theory that the cutting of the phone line was anything other than an attempt to facilitate the robbery.

### 3. *Count 30 (False Imprisonment)*

Defendants argue, and the People concede, that section 654 requires the sentence in count 30 for false imprisonment of Taylor during the October 26, 2015 hydroponics store robbery to be stayed.  We accept the People's concession.  The court stayed punishment for the robbery of Taylor (count 25) and imposed a sentence for assault with a semiautomatic firearm on Taylor (count 27) related to the same incident.  The prosecution also argued count 30 should be stayed, though it presented a proposed sentence that did not reflect this.  The sentence on count 30 should have been stayed.

### J. *Sentences for Counts 32 through 35*

The trial court sentenced Ruben and Luna to nine years plus one year for the arming enhancement under section 12022, subdivision (a)(1) for conspiracy to commit robbery in count 32, and stayed sentences on counts 33 through 35.  The court misstated the maximum sentence for conspiracy to commit robbery, which is five years not including the enhancement.  (§§ 182, 213.)  Moreover, among counts 32 through 35, their convictions for assault with a semiautomatic firearm on B.T. in count 35 has the longest possible maximum sentence—9 years under section 245, subdivision (b).  Further, a sentence enhancement may not be imposed under section 12022, subdivision (a)(1) for a conviction for assault with a semiautomatic firearm.  (*People v. Sinclair* (2008) 166 Cal.App.4th 848, 855-856.)  Thus, Ruben and Luna argue, and the People concede, that count 35 should have been imposed, and counts 32 through 34 stayed, with a total sentence for counts 32 through 35 of nine years rather than 10.  We accept this concession.

### K. *Errors in the Abstracts of Judgment*

Ruben argues, and the People concede, that his abstract of judgment erroneously indicates he was convicted of second-degree murder rather than first-degree murder.  As

the People note, the abstracts of judgment for all defendants require this correction. The jury was instructed on murder only under the theory of felony murder with the underlying felony being robbery or residential burglary, which is murder in the first degree. (§ 189, subd. (a).) Defendants' sentences for murder reflect that they were convicted of first-degree murder. (See § 190.) The abstracts of judgment must be corrected to reflect this fact.

Ruben also argues, and the People concede, that his abstract of judgment incorrectly reflects that the sentences on counts 8 and 9 were stayed pursuant to section 654. These sentences were not stayed. As the People note, the same error requires correction in Luna's abstract of judgment. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [oral pronouncement controls over abstract of judgment].)

Ruben further contends, and the People agree, that the sentences for counts 8 and 9 should be life with the possibility of parole rather than seven years to life. We accept the People's concession. (§ 209, subd. (b)(1).) Additionally, as the People contend, the same corrections must be made to Luna's sentences for these counts.

### III. DISPOSITION

Phil's conviction as to count 31 is reversed with directions to dismiss the count. The trial court's finding that Phil's New York conviction for manslaughter in case No. 03723-90 was a serious felony and a strike under California law for sentencing purposes is reversed, and the matter is remanded for resentencing consistent with this opinion. The court shall stay the execution of sentence on counts 5, 6, 20, and 30 pursuant to section 654. Further, the new abstract of judgment shall reflect a conviction for first-degree murder as to count 1. The judgment as to Phil is otherwise affirmed.

Ruben's and Luna's convictions as to count 31 are reversed with directions to dismiss the count. The trial court shall modify their judgments to stay the execution of sentence on counts 5, 6, 20, 30, and 32 through 34 pursuant to section 654, and to impose a term of nine years on count 35. The court shall modify their abstracts of judgment to

50

reflect that the sentences imposed for counts 8 and 9 are an unstayed term of life with the possibility of parole and to reflect a conviction for first-degree murder as to count 1.  As so modified, the judgments as to Luna and Ruben are otherwise affirmed.

The trial court is directed to prepare amended abstracts reflecting the modifications and corrections ordered by this court and to forward certified copies of the abstracts to the Department of Corrections.

/S/

RENNER, J.

We concur:

/S/

ROBIE, Acting P. J.

/S/

KRAUSE, J.